# IN THE COURT OF APPEALS OF IOWA

No. 21-0670
Filed July 21, 2021

**IN THE INTEREST OF K.T.,**
**Minor Child,**

**J.T., Mother,**
Appellant.
_____

Appeal from the Iowa District Court for Polk County, Lynn Poschner, District Associate Judge.

A mother appeals the termination of her parental rights to her one-year-old daughter. **AFFIRMED.**

Jane M. White of Gribble, Boles, Stewart & Witosky, Des Moines, for appellant mother.

Thomas J. Miller, Attorney General, and Mary A. Triick, Assistant Attorney General, for appellee State.

Karl Wolle of the Juvenile State Public Defender's Office, Des Moines, attorney and guardian ad litem for minor child.

Considered by Bower, C.J., and Tabor and Ahlers, JJ.

**TABOR, Judge.**

A mother, Jessica, appeals the termination of her parental rights to one-year-old K.T. In ending their legal relationship, the juvenile court cited Jessica's methamphetamine use, "her refusal to acknowledge the extent of her drug problem," and her failure to address her mental health. Contesting that order, Jessica argues the State did not offer clear and convincing evidence her daughter could not be safely returned to her care and termination is not in the child's best interests. Jessica also asserts the court should have granted her six more months to work toward reunification.

Because Jessica has denied her drug addiction and did not obtain mental-health services, we find sufficient evidence to support termination under Iowa Code section 232.116(1)(h) (2021).[1] From that same evidence, we also find a six-month extension was not warranted and termination is in K.T.'s best interests.

## I. Facts and Prior Proceedings

K.T. was born in late April 2020. The Iowa Department of Human Services (DHS) launched a child-abuse investigation after both Jessica and the baby tested positive for methamphetamine. When confronted about her drug use, Jessica admitted consuming methamphetamine before realizing she was pregnant but

---

[1] We review termination proceedings de novo. *In re A.S.*, 906 N.W.2d 467, 472 (Iowa 2018). We are not bound by the juvenile court's factual findings, but we accord them deference, especially on credibility determinations. *In re M.W.*, 876 N.W.2d 212, 219 (Iowa 2016). The State must prove the allegations in its petition by clear and convincing evidence. *Id.* That burden is satisfied "when there are no 'serious or substantial doubts as to the correctness [of] conclusions of law drawn from the evidence.'" *In re D.W.*, 791 N.W.2d 703, 706 (Iowa 2010) (quoting *In re C.B.*, 611 N.W.2d 489, 492 (Iowa 2000)).

insisted she had been sober since February.[2]  She claimed her positive urine screen two months later stemmed from residing with her ex-boyfriend, who "used around her often."  Despite her excuse, an umbilical cord blood test confirmed K.T.'s methamphetamine exposure at birth.  Based on those results, the DHS issued a founded child-abuse assessment and obtained approval for a temporary removal.  In confirming the removal, the juvenile court determined Jessica could not resume custody of K.T. because of "unresolved issues of substance abuse and domestic violence."[3]  Before the next hearing, the court ordered Jessica to comply with random drug testing and participate in a family team meeting.  The court also directed the DHS to schedule visits "as frequently as possible."

In June 2020, the court adjudicated K.T. as a child in need of assistance (CINA).  The court cited Jessica's ongoing methamphetamine use and her unwillingness to seek treatment for her mental health.  Just three weeks before the CINA adjudication, Jessica underwent a sweat-patch test that detected methamphetamine in her system.  She refuted those results, claiming the sweat patch may have picked up drug residue on her clothing or in her car.  She pointed out her more recent urinalysis was negative for all illegal drugs.  Yet later that same month, Jessica wore a seven-day sweat patch that again tested positive for methamphetamine.

---

[2] According to Jessica, she did not know she was pregnant until twenty-five weeks.
[3] Jessica's ex-boyfriend, Jeremy, was convicted of domestic abuse assault in 2019 and is currently incarcerated.  Jessica reported that "[he] nearly killed her when he beat her," requiring her to undergo reconstructive surgery for her injuries.  In the removal order, the juvenile court identified Jeremy as K.T.'s father.  But paternity testing later excluded Jeremy as the biological father.

At a contested dispositional hearing, Jessica disputed her sweat-patch test results as unreliable. She offered three scientific studies to prove sweat patches could produce false positives through environmental contamination. The juvenile court was unconvinced, remarking "none of these articles support a conclusion that sweat patch testing is not reliable." Although the court acknowledged Jessica's success in participating in child-parent psychotherapy sessions and supervised visits, it denied her request for K.T. to be returned to her custody. The court reasoned her ongoing drug use and lack of treatment rendered her home unsafe for an infant.

Over the next few months, Jessica provided two more positive sweat-patch tests, one worn for seven days in October and one in December. Both times she also conducted at least one urine test that came back negative. The juvenile court addressed that discrepancy in its CINA review ruling, noting "[t]he difference in these two test results does not necessarily lead to the conclusion that either test was faulty." Beyond her four positive drug screens, the court identified Jessica's "hostile and aggressive behavior, evasive and deceptive behavior, and misremembering conversations with DHS" as symptoms of her drug use.

In January 2021, the State petitioned for termination of parental rights. Only then did Jessica begin substance-abuse treatment. For the termination hearing, Jessica recruited an expert witness to attest to the unreliability of sweat-patch tests. The State offered a rebuttal witness. After hearing from both experts, the juvenile court found the sweat-patch test results were reliable. The court determined "Jessica tested positive for methamphetamine because [she] used methamphetamine." The court added that Jessica's denial of methamphetamine

use for the past year put "her sobriety and recovery . . . seriously in question." In that same vein, the court questioned Jessica's ability to overcome her drug addiction when she had not yet addressed her trauma and mental-health issues stemming from her assault. In the court's view, her substance abuse and mental health were "intertwined." Finding six months insufficient to resolve those concerns, the court denied her request for a delay in permanency. Jessica appeals.

## II. Analysis

### A. Ground for Termination

The juvenile court cited section 232.116(1)(h) as the sole ground for termination. For this statutory ground, the State must prove by clear and convincing evidence these elements:

> (1) The child is three years of age or younger.
> (2) The child has been adjudicated a child in need of assistance pursuant to section 232.96.
> (3) The child has been removed from the physical custody of the child's parents for at least six months of the last twelve months, or for the last six consecutive months and any trial period at home has been less than thirty days.
> (4) There is clear and convincing evidence that the child cannot be returned to the custody of the child's parents as provided in section 232.102 at the present time.

Jessica contests only the fourth element. She argues the State failed to prove that K.T. would be exposed to further harm if returned to her care. To counter the State's allegations, Jessica highlights her recent progress toward reunification: "She had obtained safe and appropriate housing, had negative drug screens for nearly three months, was working with a variety of providers in a positive way and had continued to fully participate in all of her visits." She contends

the juvenile court gave unworthy weight to the positive sweat-patch results.[4] Alternatively, she argues even if we accept the premise "that she was ingesting methamphetamine during this case, the State has still not shown how that use, by itself, supports termination in light of all of the other progress made."

But the juvenile court looked at more than just Jessica's drug use. The court was rightly concerned about her lack of insight into the danger that her methamphetamine addiction posed to K.T. *See In re J.S.,* 846 N.W.2d 36, 42 (Iowa 2014); *In re J.P.,* No. 19-1633, 2020 WL 110425, at *2 (Iowa Ct. App. Jan. 9, 2020) ("A parent's methamphetamine use, in itself, creates a dangerous environment for children."). We acknowledge Jessica's recent efforts to maintain sobriety. From January 2021 until the March termination hearing, Jessica did not have any positive drug tests and attended weekly substance-abuse counseling. Despite that progress, we cannot overlook her persistent denial of addiction during the past year. Her excuses about why she tested positive for methamphetamine throughout the CINA case cast doubt on her willingness to overcome her addiction. As does her belated start at treatment.

Plus, the State presented evidence of Jessica's unaddressed mental-health issues. A substance-abuse counselor believed Jessica's drug addiction was linked to "a history of trauma and abuse, starting in childhood and continuing

---

[4] Although Jessica insists her sweat patches were contaminated, we defer to the juvenile court's factual findings on her credibility and the reliability of the sweat-patch results. The juvenile court's stance on sweat-patch tests adheres to our recent case law. *See In re A.C.*, No. 20-0736, 2020 WL 4516075, at *2 (Iowa Ct. App. Aug. 5, 2020) (collecting cases). Given Jessica's long-standing history of methamphetamine use, including during her pregnancy, we find no compelling reason to doubt the reliability of the sweat-patch results.

through adulthood." Yet Jessica was still awaiting her first intake for mental-health services. *See In re A.M.*, 843 N.W.2d 100, 111 (Iowa 2014) (noting the parent must be ready to resume custody by the termination hearing). When asked about the delay in seeking therapy, Jessica claimed it was out of her control, noting communication and scheduling difficulties. But the juvenile court described Jessica as being "unconcerned" about having no contact with her therapist. Because the record establishes that Jessica's substance abuse and mental health are inseparable issues, her lack of mental-health treatment supports the court's determination she was no closer to reunification after eleven months than she was at K.T.'s removal. On our de novo review, we find clear and convincing evidence to support termination under section 232.116(1)(h).

### B. Best Interests

Even when sufficient evidence supports a statutory ground, we must determine whether termination is in the child's best interests. *In re P.L.*, 778 N.W.2d 33, 35 (Iowa 2010). Our best-interests determination requires consideration of the child's safety, as well as the best placement for her "long-term nurturing and growth" and her "physical, mental, and emotional condition and needs." Iowa Code § 232.116(2). Jessica contends termination "would cause emotional harm to K.T." She emphasizes their strong bond and positive interactions. We agree the record reveals a loving connection between K.T. and Jessica. But despite their bond, we must give greater weight to K.T.'s safety and need for a permanent home. *In re H.S.*, 805 N.W.2d 737, 748–49 (Iowa 2011) (reiterating a child's safety and need for permanency are "paramount concerns" and "more important than" a close bond (citing *In re J.E.*, 723 N.W.2d 793, 802

(Iowa 2006) (Cady, J., specially concurring))). Although Jessica attended most of her scheduled visits, she remained unable to interact with K.T. on her own. The case manager expressed concerns about Jessica's mental health and substance abuse after nearly a year of services. Because Jessica continues to struggle with those issues, termination is in the child's best interests.

### C. Delayed Permanency

As an alternative to termination, Jessica urges the juvenile court should have granted her "six more months to prove her abstinence from methamphetamine." To grant a parent's request for a delay in permanency, the record must convince the court "that the need for removal of the child from the child's home will no longer exist at the end of the additional six-month period." Iowa Code § 232.104(2)(b). We are not convinced.

As the juvenile court noted, "Jessica's engagement in substance abuse treatment and her sobriety are tempered by her refusal to acknowledge the extent of her drug problem." Given Jessica's history of methamphetamine use and unaddressed trauma, the court properly decided "there simply is not enough evidence to support a finding that [K.T.] can be safely returned to Jessica within the next six months." Meanwhile, K.T. has been in foster care for over a year and should not have to wait any longer. *See In re N.F.*, 579 N.W.2d 338, 341 (Iowa Ct. App. 1998) (noting child's interest in permanency "must prevail over [the parent's] uncertain battle with drugs"). The juvenile court properly denied Jessica's request for more time. Thus, we affirm the termination order.

**AFFIRMED.**